UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARCREASE DELANCE FARMER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 1:24-cv-00081-SRC |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**Memorandum and Order**

Petitioner Marcrease Farmer asks the Court to vacate his sentence under 28 U.S.C. § 2255. He makes two arguments: that he suffered from constitutionally ineffective assistance of counsel during the *voir dire* phase of his trial, and that the Court erred in denying his motion for a new trial due to alleged juror bias. Having carefully reviewed the record, the Court holds that Farmer has not demonstrated entitlement to relief or an evidentiary hearing under Section 2255, and accordingly denies his motion.

**I.      Statement of facts[1]**

After a jury found Farmer guilty on three counts, doc. 90, the Court held a sentencing hearing at which it overruled Farmer's objections, doc. 119, to the presentence report, *see* doc. 120; doc. 145, Sentencing Tr. 11:14–37:6. The PSR describes the following facts:

> 1.      On July 22, 2021, [Farmer] was found guilty by jury trial of three counts of a three-count Indictment. Counts 1 through 3 charged Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B).
>
> . . .
>
> 6.      According to government records and investigative reports of the Missouri State Highway Patrol (MOSHP) and the Drug Enforcement Administration (DEA),

---

[1] The "doc." cites in this section are from *United States v. Marcrease Delance Farmer*, 1:19-cr-00183-SRC-1.

on or about July 15, 2019, July 24, 2019, August 2, 2019, August 8, 2019, and August 21, 2019, in Stoddard County, Missouri, within the Southeastern Division of the Eastern District of Missouri, Marcrease Delance Farmer[] knowing[ly] and intentionally distributed fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine. . . .

7.	On July 16, 2019, a MOSHP Trooper was conducting an undercover narcotics investigation.  As a result of the investigation, the trooper, acting in an undercover capacity, contacted [Farmer] via text and asked him if he was able to sell one ounce of methamphetamine for $500 on July 16, 2019.  Farmer told the trooper to "pull up whenever."  On July 16, 2019, the trooper sent [Farmer] a text stating he was going to meet Farmer to purchase the one ounce of methamphetamine.  The defendant replied, "K."  The trooper drove to Farmer's house located at 200 Peck Street, Malden, Missouri.  The trooper texted [Farmer] when he got to the residence.  Farmer sent a text back requesting the trooper give him some time, and he would be there.  The defendant later sent a text to the trooper stating he was home and to come to the residence.  A MOSPH Trooper and a Southeast Missouri Drug Task Force (SEMO DTF) Officer provided surveillance.  Upon arrival, the undercover trooper observed Farmer's vehicle pull underneath the carport.  The trooper waited a short period of time for [Farmer] to exit the residence.  The trooper walked to the door under the carport and knocked on the door.  Farmer answered the door, and the trooper entered the residence.  The lighting in the residence was very poor; however, the trooper was able [to] see several other males standing in the kitchen.  The defendant and the trooper stood by the wall of the kitchen.  Farmer told the trooper that the product was light, and his supplier stated that was all he had left.  [Farmer] stated he was told by the supplier that it was approximately 27 grams, but he still needed $500.  The trooper stated he would take it, and they would make it up on the next transaction, to which Farmer agreed.  [Farmer] pointed at a paper towel sitting in a kitchen chair behind an unknown male. The trooper tried to give the requested money to Farmer, but he told the trooper to put it on the kitchen table.  The trooper picked up the paper towel, which contained a baggie of suspected crystal methamphetamine.  The trooper placed the product into his pocket and walked toward the door.  Before he left the residence, the trooper talked with [Farmer] about future drug transactions.  The trooper then exited the residence and vacated the area.  The crystal substance field tested positive for the presence of methamphetamine with a field weight of 28.1 grams. . . .

8.	On July 24, 2019, the trooper contacted Farmer via text and stated he needed one half ounce.  They agreed to meet at the former Cross Roads convenience store at 3037 State Highway H. Bernie, Missouri.  A MOSPH Trooper and SEMO DTF Officers provided surveillance.  Upon arrival, the undercover trooper observed [Farmer]'s vehicle, a green Mercury Grand Marquis, parked on the north side of the parking lot facing east.  The trooper pulled next to Farmer's vehicle.  [Farmer] handed the trooper a Newport cigarette box containing suspected crystal methamphetamine.  The trooper handed Farmer the money.  He asked if the price was $250.  [Farmer] counted the money and stated the trooper did not give him

enough. Farmer handed the money back, and the trooper realized he had only given the defendant $210. The trooper added $40 and handed the money back to Farmer. The trooper talked with [Farmer] about doing future transactions at the same location. They both then vacated the area. The crystal substance field tested positive for the presence of methamphetamine with a field weight of 14.9 grams. . . .

9. On August 2, 2019, the trooper contacted [Farmer] via text, and agreed that the trooper would purchase two ounces of crystal methamphetamine for $950. They both agreed to meet at the former Cross Roads convenience store. SEMO DTF Officers provided surveillance. While the undercover trooper was traveling to the meet location, he received a call from Farmer stating he was locked out of his residence, and he needed to postpone the meet. [Farmer] agreed to reduce the price for the methamphetamine by $20 for the trooper's troubles. Farmer sent the trooper a text stating he would be at the meet location at approximately 3:50 p.m. [Farmer] then called the trooper at approximately 3:48 p.m. stating he was close, and they agreed to me[et] at the same location. Upon arrival, the trooper observed Farmer's vehicle pulling into the parking lot. The trooper pulled next to [Farmer]'s vehicle. Farmer asked the trooper if he liked chips and handed the trooper an orange Sun Chips bag containing suspected crystal methamphetamine. The trooper handed [Farmer] $930. The trooper asked Farmer about getting the product cheaper in the future. [Farmer] encouraged the trooper to partner up with him. Farmer stated they could go in on one pound together for $3,500, which would cost each party $1,750. [Farmer] stated once the trooper paid him, he would have to go get it, and the trooper would have it within an hour or two. The trooper stated he was interested and would contact him later. They both vacated the area. The crystal substance field tested positive for the presence of methamphetamine with a field weight of 62 grams. . . .

10. On August 6, 2019, the trooper was in contact with Farmer via text stating he had $1,750 for one half pound of crystal methamphetamine and would be ready to do the drug transactions on August 8, 2019. [Farmer] stated, "K let me know." On August 8, 2019, the trooper began to communicate with Farmer via text and decided on an approximate [time] to meet at the former Cross Roads convenience store. Surveillance was provided by MOSPH Troopers and SEMO DTF Officers. The undercover trooper parked on the parking lot of the convenience store and waited for [Farmer] to arrive. Farmer arrived at the parking lot and informed the trooper that he was getting over three and one[-]half ounces. The trooper asked [Farmer] about the eight ounces that they agreed to. Farmer stated he did not have the money to hold up his end of the agreement, which was to go in together on approximately one pound. [Farmer] handed the trooper a "Red Jordan" fanny pack. Inside the fanny pack was the suspected methamphetamine along with some loose small denominations of U.S. currency. Farmer told the trooper to take $50 out. The trooper took . . . the suspected methamphetamine out of the fanny pack. The trooper placed $1,700 into the fanny pack and gave it back to [Farmer]. They both vacated

3

the area.  The crystal substance field tested positive for the presence of methamphetamine with a field weight of 105 grams. . . .

11.     On August 15, 2019, the trooper was in contact with Farmer via text and eventually talked about going in together on one pound.  On August 19, 2019, the trooper was in contact with [Farmer] via [text] and asked him how much it was going to cost to purchase one half pound.  Farmer stated he was "waiting for word back."  On August 20, 2019, [Farmer] stated, "My ppl [sic] bad I had to link up with you my cousin's they [sic] on the same tip."  The trooper told Farmer he would be around the next day and needed a price on the one half pound.  [Farmer] indicated he wanted to talk about the details face to face.  The trooper stated he would not be back in the area until later.  The trooper told Farmer he would call him.  The trooper called [Farmer].  During the conversation, Farmer stated his supplier was moving, and [Farmer] could not travel.  Farmer stated his supplier was coming that night.  The trooper told [Farmer], he was not going to be around.  They discussed that Farmer hold the methamphetamine until August 21, 2019, when the trooper would return to the area. [Farmer] stated he was going to text the trooper a price and agreed to meet on August 21, 2019.  On August 21, 2019, Farmer sent the trooper a text stating, "Green light they asking 22 8piece."  This was understood to mean that [Farmer]'s supplier wants $2,200 for eight ounces.  After some additional texts, Farmer called the trooper stating he was going to call his supplier and call the trooper back.  The trooper also confirmed the price of $2,200 for approximately eight ounces.  [Farmer] called the trooper back and stated he would be at the meet spot in ten minutes.  Surveillance was provided by the MOSHP Officers and SEMO DTF Officers.  The undercover trooper parked on the parking lot of the former Cross Roads convenience store and waited for Farmer to arrive.  [Farmer] arrived in a silver Ford Mustang and pulled up next to the trooper's vehicle.  Farmer requested that the trooper get in with him.  The trooper exited his vehicle and entered the passenger seat of [Farmer]'s vehicle.  The trooper observed a black plastic sack on the passenger side floorboard.  The trooper asked Farmer if the black bag was the product, and [Farmer] indicated it was. The trooper picked up [the] sack and observed a clear plastic baggie containing suspected crystal methamphetamine inside.  The trooper gave Farmer the $2,200.  After some small talk, the trooper and [Farmer] vacated the area.  The crystal substance field tested positive for the presence of methamphetamine with a field weight of 228 grams. . . .

12.     The controlled substances were submitted to the MOSHP Crime Laboratory for analysis with the following results:  26.72 grams of methamphetamine, which was seized on July 16, 2019; 13.57 grams of methamphetamine, which was seized on July 24, 2019; 50.9 grams of methamphetamine (actual), which was seized on August 2, 2019; 92.7 grams of methamphetamine (actual), which was seized on August 8, 2019; and 210 grams of methamphetamine (actual), which was seized on August 21, 2019.  The total amount of methamphetamine (actual) was 353.6 grams, and the total amount of methamphetamine was 40.29 grams.

4

Doc. 120 at ¶¶ 1, 6–12 (emphasis omitted).  Having presided over the trial, the Court finds that the facts stated in the PSR reflect the evidence adduced at trial.  And at sentencing, the Court adopted the PSR as its findings of fact and conclusions of law regarding the advisory guidelines.  Doc. 145, Sentencing Tr. 43:14–16.

## II. Procedural history

### A. Criminal proceedings[2]

In December 2019, a federal grand jury returned a three-count indictment against Farmer, charging him with three counts of knowingly and intentionally distributing fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine, a controlled substance, in violation of 21 U.S.C. § 841(a)(1).  Doc. 1.  Farmer pleaded not guilty, doc. 11, and after a two-day jury trial, *see* docs. 85–86, the jury found him guilty on all counts, doc. 90.

The United States Probation Officer then prepared a PSR, calculating Farmer's total offense level as 32 and his criminal history category as V, resulting in a guidelines range of 188 to 235 months of imprisonment.  Doc. 120 at ¶¶ 28, 40, 70.  In December 2021, the Court held a sentencing hearing at which it sentenced Kimble to a within-guidelines sentence of 210 months, followed by a four-year term of supervised release.  *See* docs. 130–31.  Before imposing its sentence, the Court confirmed that Farmer was satisfied with the services rendered him by defense counsel throughout the criminal proceedings in this case:

> **THE COURT:** [S]ince the trial have you had enough time to speak with [defense counsel Zachary] Borowiak and have him answer all of your questions relating to sentencing?
>
> **[FARMER:]** Yes, Your Honor.
>
> **THE COURT:** Are you fully satisfied with the services of Mr. Borowiak that he's provided to you in this case?

---

[2] The "doc." cites in this section are from *United States v. Farmer*, 1:19-cr-00183-SRC-1.

    [FARMER]:        Yes, Your Honor.

Doc. 145, Sentencing Tr. 3:3–10.

After sentencing, Farmer appealed, arguing that a biased jury and improper judicial factfinding violated his Sixth Amendment rights, and challenging three evidentiary rulings the Court made during his trial. *See* doc. 153. The Eighth Circuit affirmed, *see id.*, and denied Farmer's request for a rehearing, doc. 154. The Supreme Court then denied Farmer's petition for certiorari. Doc. 159. Farmer is currently serving his sentence at Yazoo City Medium FCI in Mississippi with a projected release date of November 2, 2034.[3]

    **B.**    **Civil proceedings**

In April 2024, Farmer timely filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. Docs. 1, 2. He makes two arguments: that he suffered from ineffective assistance of counsel because counsel failed to question and then strike an eventual juror during the *voir dire* process; and that the Court erred in its denial of his motion for a new trial due to juror bias. *Id.* The United States timely filed its response, doc. 7, and Farmer timely filed his reply, doc. 8, rendering Farmer's motion to vacate, doc. 1, ripe for the Court's review.

**III.**    **Standard of review**

    **A.**    **Section 2255**

Under Section 2255, a federal prisoner "may move the court which imposed [his] sentence to vacate, set aside or correct the sentence" on the grounds that the court imposed "the sentence . . . in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). If a

---

[3] Find an inmate, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited August 21, 2024).

petitioner claims his sentence violates the Constitution or laws of the United States, the petitioner must establish that the violation constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez*, 326 F.3d 971, 974 (8th Cir. 2003) (first quoting *United States v. Boone*, 869 F.2d 1089, 1091 n.4 (8th Cir. 1989); and then citing Fed. R. Crim. P. 32(d) advisory committee notes to the 1983 amendments). Generally, to obtain section 2255 relief, a petitioner must have raised the underlying error on direct appeal. *See Roundtree v. United States*, 885 F.3d 1095, 1097 (8th Cir. 2018). If a petitioner failed to do so, the Court considers the claim procedurally defaulted, rendering it ineffective in establishing a right to section 2255 relief. *See id.*

If the petitioner's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994). A petitioner is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the petitioner] to relief." *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)). However, a court may dismiss a claim without a hearing "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw*, 24 F.3d at 1043 (citing *Larson v. United States*, 905 F.2d 218, 220–21 (8th Cir. 1990)).

### B. Ineffective assistance of counsel

A petitioner may raise an ineffective-assistance-of-counsel claim for the first time in a § 2255 motion, even if he could have raised the same claim on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). This exception to the procedural-default rule exists to prevent petitioners from being forced "to raise the issue before there has been an opportunity fully to

7

develop the factual predicate for the claim." *Id.* Additionally, a petitioner's attorney may serve as counsel for both trial and appellate proceedings, and it is unlikely that the attorney would raise a claim of his own ineffective assistance on appeal. *See United States v. Rashad*, 331 F.3d 908, 911 (D.C. Cir. 2003).

To establish ineffective assistance of counsel, a petitioner "faces a heavy burden." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996)). He must show both that his counsel's performance was deficient and that the deficient performance prejudiced the petitioner's case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Sera*, 267 F.3d 872, 874 (8th Cir. 2001). An attorney's performance is deficient only if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88; *see also Sera*, 267 F.3d at 874. Two substantial impediments exist to making such a showing. First, "a 'strong presumption'" exists "that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689). Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690).

## IV.   Discussion

Farmer's § 2255 petition makes two distinct arguments. *See* docs. 1–2. The Court addresses each in turn.

### A.   Motion for a new trial

Farmer argues that the Court erred by denying his motion for a new trial on juror-bias grounds. Doc. 2 at 3–7. But his argument rehashes the same claims of juror bias that the Court already addressed in its order denying Farmer's motion for a new trial, *see United States v.*

8

*Farmer*, No. 1:19-cr-00183-SRC-1, doc. 128 at 6–19, and that the Court further addresses below in the ineffective-assistance-of-counsel context.  In its order, the Court carefully analyzed Farmer's claim under the Eighth Circuit's juror-bias test before denying his motion.  *Id.* at 17–19.  And when Farmer appealed the Court's denial of his motion, the Eighth Circuit affirmed, explaining that it could not conclude "that the situation here was 'extreme' enough that an 'average person' in Juror 11's shoes would have been 'highly unlikely' to 'remain impartial.'" *United States v. Farmer*, No. 21-3906, 2023 WL 2397028, at *2 (8th Cir. March 8, 2023) (per curiam) (quoting *Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 843 (8th Cir. 2015)).

Having lost on appeal, Farmer cannot now relitigate the same claims under § 2255.  *See Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003) ("It is well settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." (quoting *United States v. Shabazz*, 657 F.2d 189, 190 (8th Cir. 1981)) (internal quotation marks omitted)).  Accordingly, the Court denies Farmer's request for relief under Section 2255 on the basis of his claim that the Court erred in its denial of his motion for a new trial.

## B. Ineffective assistance of counsel

Farmer also argues that defense counsel provided constitutionally ineffective assistance of counsel by failing to question or strike Juror 11 from the venire panel based on information Farmer's sister provided counsel during the *voir dire* process.  Doc. 2 at 1–3.  He alleges that his sister, Jahvashea,[4] spoke to defense counsel during a break in the *voir dire* process, telling counsel that she recognized Juror 11 from a "prior altercation . . . over [Jahvashea's] filing felony charges for the destruction of property against" Juror 11.  Doc. 2 at 1–3.  And he

---

[4] Where the Court uses first names, it does so for the sake of clarity, not to imply familiarity.

complains that based on that conversation, defense counsel should have "question[ed Juror 11] regarding the information he obtained [or] move[d] to strike for cause." *Id.* at 2.

But "the record affirmatively refutes the factual assertion[] upon which [Farmer's claim] is based." *Shaw*, 24 F.3d at 1043 (citing *Larson*, 905 F.2d at 220–21). Instead, the record reflects that no such conversation between Jahvashea and defense counsel regarding Juror 11 occurred during *voir dire*: in his motion for a new trial based on the same argument, Farmer himself argued that "[i]t is fair to conclude that the negative interaction with [Farmer]'s family caused [Juror 11] to be biased against [Farmer]. [And h]ad this bias been known, [Juror 11] would have been struck for cause due to her bias." *United States v. Farmer*, No. 1:19-cr-00183-SRC-1, doc. 99 at 5. If, as the record reflects, defense counsel did not know of the prior interactions between Jahvashea and Juror 11 during *voir dire*, then the record refutes Farmer's contrary assertion that Jahvashea spoke to defense counsel about those interactions during *voir dire*. Further, if defense counsel did not speak with Jahvashea during *voir dire* about her prior interactions with Juror 11, defense counsel could not have been constitutionally ineffective for failure to question Juror 11 about "the information he obtained" from that conversation. Doc. 2 at 2.

Even if defense counsel's conduct had been deficient during *voir dire*, Farmer still fails to demonstrate that he suffered from ineffective assistance of counsel, because Farmer cannot satisfy the second prong of the *Strickland* test—namely, that he suffered prejudice as a result of defense counsel's deficient performance. *Strickland*, 466 U.S. at 687. Farmer argues that defense counsel's failure to strike Juror 11 during *voir dire* left "this obviously bias[ed] Juror" impaneled to hear his case. Doc. 2 at 3. But "[b]ecause 'courts presume that a prospective juror is impartial,' establishing juror partiality is a high hurdle." *United States v. Needham*, 852 F.3d

10

830, 839 (8th Cir. 2017) (quoting *Moran v. Clarke*, 443 F.3d 646, 650 (8th Cir. 2006)). "Essentially, to fail this standard, a juror must profess his inability to be impartial and resist any attempt to rehabilitate his position." *Id.* (quoting *Moran*, 443 F.3d at 650–51).

Here, by contrast, as the Court explained in its order denying Farmer's motion for a new trial, the record demonstrates Juror 11's impartiality, not her bias. *See United States v. Farmer*, No. 1:19-cr-00183-SRC-1, doc. 128 at 17–19. After seeing Jahvashea outside of the courtroom during a break in the *voir dire* process, Juror 11 came forward on her own initiative during *voir dire* to disclose to the Court that she had recognized Farmer's sister, then stated multiple times that recognizing Jahvashea would not affect her ability to be an impartial juror. *See id.*, doc. 93, Trial Tr. 66:24–74:7; *United States v. Ruiz*, 446 F.3d 762, 770 (8th Cir. 2006) ("the juror's honesty is reflected by her self-disclosure"). That sequence of events demonstrates the opposite of the standard expounded in *Needham* for showing juror bias.

Finally, Farmer appears to argue that Juror 11's relationship to Jahvashea gives rise to an implied inference of bias. *See* doc. 1 at 13. Juror 11, he claims, "was related to the Farmers by marriage" because her husband "is a nephew to the Defendant's uncle . . . by marriage." *Id.* But even if that were true, no implied bias exists: implied bias occurs only "in certain egregious situations" in which "the relationship between a prospective juror and some aspect of the litigation . . . [makes it] highly unlikely that the average person could remain impartial." *Needham*, 852 F.3d at 840 (quoting *Manuel*, 791 F.3d at 843). Here, by contrast, Farmer makes no claim that Juror 11 had a relationship with "some aspect of the litigation," *id.*; in fact, Juror 11 expressly stated at *voir dire* that she did not know Farmer at all, *United States v. Farmer*, No. 1:19-cr-00183-SRC-1, doc. 93, Jury Tr. at 69:4–18.

For these reasons, the Court finds that Farmer has shown neither that defense counsel exhibited deficient performance nor that Farmer suffered prejudice as a consequence of such performance. Accordingly, the Court denies Farmer's request for relief under Section 2255 on ineffective-assistance-of-counsel grounds.

## V.     Certificate of appealability

For the Court to issue a certificate of appealability, Farmer must make a substantial showing that he suffered the denial of a constitutional right. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). A substantial showing means one indicating that reasonable jurists could debate the issues, a court could resolve the issues differently, or the issues deserve further proceedings. *Id.* But as shown in the discussion above, Farmer has not made such a showing. Accordingly, the Court declines to issue a certificate of appealability in this case.

## VI.    Conclusion

The Court finds that the record conclusively establishes that 28 U.S.C. § 2255 does not entitle Farmer to relief or an evidentiary hearing. Accordingly, the Court denies Farmer's Motion to Vacate, Set Aside, or Correct Sentence. Doc. 1. A separate judgment accompanies this memorandum and order.

So ordered this 28th day of August 2024.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE